477 F.2d 1073
 Donald CONOVER, on his own behalf and on behalf of all
others similarly situated, and Gerald Myers, a
minor by his parent and natural
guardian, Margaret Myers, Appellants,
v.
Honorable Frank M. MONTEMURO, Jr., Administrative Judge,
Family Court Division, Philadelphia Court of Common Pleas,
and Leonard Rosengarten, Director, Juvenile Probation,
Family Court Division, Philadelphia Court of Common Pleas.
 No. 71-1871.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 15, 1972.
Decided Dec. 20, 1972.
As Amended Jan. 16, 1973.
Resubmitted en banc March 29, 1973.
On Rehearing En Banc May 8, 1973.
 
 Edwin D. Wolf, Lawyers' Committee for Civil Rights Under Law, J. Grant McCabe III, Philadelphia, Pa., for appellants.
 John B. Martin, Duane, Morris & Heckscher, Joseph Matusow, Philadelphia, Pa., for appellees.
 Before McLAUGHLIN, ADAMS and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This is an appeal from an order of the district court dismissing a class action which challenged on due process and equal protection grounds the intake procedures of the Family Court Division of the Philadelphia Court of Common Pleas. The action has had an unfortunately complex procedural history, a recitation of which is necessary for an appreciation of the exact issues presented to this court for review.
 
 
 2
 The action was filed originally by the plaintiff Conover, on his own behalf and on behalf of all others similarly situated, on April 8, 1969. Conover, a juvenile, alleged that he had been arrested on three occasions and had on each occasion been subjected to an "intake interview" by probation officers employed by the Philadelphia Juvenile Court. These probation officers, he alleged, in an essentially standardless procedure, or at least a procedure employing standards in no way related to the purposes of the Pennsylvania Juvenile Court Law of 1933, decide whether to file a petition, pursuant to section 4 of that law, Pa.Stat.Ann. tit. 11, Sec. 246 (1965). That complaint referred to the provision of the juvenile court law prohibiting preliminary hearings in juvenile cases, Pa.Stat.Ann. tit. 11, Sec. 246(3) (1965), and contrasted the treatment of adult offenders, who under Pennsylvania law have a right to a preliminary hearing and to indictment by a grand jury. Pa.Const. art. 1, Sec. 10. Named as defendants were Honorable Frank J. Montemuro, Jr., Administrative Judge, Family Court Division, Philadelphia Court of Common Pleas, Arlen Specter, District Attorney of Philadelphia[1] and Leonard Rosengarten, Director, Juvenile Probation, Family Court Division, Philadelphia Court of Common Pleas. The complaint sought both injunctive and declaratory relief, but not money damages. It invoked jurisdiction under 28 U.S.C. Secs. 1331 and 1343 and under 42 U.S.C. Sec. 1983. It sought class action treatment pursuant to Fed.R.Civ.P. 23, requested the convening of a three-judge district court pursuant to 28 U.S.C. Sec. 2281 et seq., and asked for the issuance of a temporary restraining order. The request for a temporary restraining order was brought on for hearing on April 9, 1969.
 
 
 3
 The district court, after a hearing, declined to issue a temporary restraining order. An appeal from that denial was taken to this court, but after oral argument that appeal was dismissed by stipulation.
 
 
 4
 The district court, pursuant to 28 U. S.C. Sec. 2284, requested then Chief Judge Hastie to convene a three-judge court. Judge Hastie declined to do so on the ground that although the complaint nominally challenged the constitutionality of Pa.Stat.Ann. tit. 11, Sec. 246 (1965), its substance was that the persons charged with the administration of the statute are exercising their power in an improper way, and not that the statute, properly construed, required the allegedly improper practices. The case thereafter proceeded before a single district court judge.
 
 
 5
 On April 18, 1969 Gerald Myers, another juvenile, filed a motion for leave to intervene on his own behalf and as a class representative, asserting a fear that settlement discussions between Conover, the original plaintiff, and the named defendants, might result in the withdrawal of prosecution in the juvenile court and an attempt by Conover to withdraw the action prior to an adjudication of the rights of the class of which Myers was a member. By an order dated May 2, 1969 Myers was permitted to intervene as plaintiff. At this time no class action determination had been made by the district court. See Fed.R. Civ.P. 23(c)(1).
 
 
 6
 Meanwhile, on April 26, 1969 the named defendants filed an answer and a motion to dismiss the complaint. Judge Montemuro and Mr. Rosengarten moved for a dismissal on the grounds (1) that the district court lacked jurisdiction, (2) that they were immune from suit, and (3) that the federal court should abstain. In a detailed opinion and order filed on September 24, 1969 Judge Fullam considered and rejected each of these contentions. Conover v. Montemuro, 304 F.Supp. 259 (E.D.Pa.1969). He denied the defendants' motion to dismiss the declaratory judgment action on jurisdictional or immunity grounds, and reserved until trial their motion to dismiss the action for an injunction.
 
 
 7
 After this interlocutory opinion and order was filed the plaintiffs Conover and Myers made a motion for an order pursuant to Fed.R.Civ.P. 23(c)(1) that the action, brought as a class action, be so maintained. The district court gave the defendants an opportunity to file any objections to the confirming of the class action, and after a hearing, over such objections, on October 8, 1970 entered the following order:
 
 
 8
 "And Now, this 8th day of October, 1970, it appearing that the class plaintiff has described in his complaint falls within the requirements of Fed. R.Civ.P. 23(b)(2), it is ORDERED that this action may be maintained as a class action on behalf of all juveniles in Philadelphia, Pennsylvania, who have been or will be affected by action of the defendants alleged in the complaint."
 
 
 9
 No other findings were made with respect to the class action determination. See Interpace Corporation v. City of Philadelphia, 438 F.2d 401 (3d Cir. 1971).
 
 
 10
 After extensive discovery the case proceeded to final hearing on April 13, 1971. In that hearing the plaintiff class representatives attempted to establish:
 
 
 11
 a. that juvenile defendants were denied equal protection on the ground that Pennsylvania law provides for discharge of adults at a preliminary hearing against whom a prima facie case is not established, but does not provide for the discharge of juveniles at the intake interview against whom a prima facie case of delinquency is not established.
 
 
 12
 b. that juvenile defendants were denied due process because of the overbroad discretion allowed to the intake interviewer and the vagueness of the standards for his decision whether to file a delinquency petition.
 
 
 13
 c. that juvenile defendants were denied due process by the arbitrary and irrational choice of cases in which to file delinquency petitions.
 
 
 14
 d. that juvenile defendants were denied due process because the intake standards were not reasonably related either to probable cause or to the purposes of the Juvenile Court Law.
 
 
 15
 Plaintiffs' principal legal arguments were based on In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and In re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970). At the completion of the hearing, in which the testimony of eight witnesses was taken and twenty exhibits received in evidence, the defendants renewed their motion to dismiss on the ground that the federal court should abstain. The renewed motion was prompted by the Supreme Court's decisions, on February 23, 1971, long after the district court's denial of the original motion, of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U. S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L. Ed.2d 781 (1971), and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). The district court asked the parties to brief the issues raised by these cases prior to the submission of proposed findings of fact. On July 21, 1971 it filed an opinion and order, 328 F.Supp. 994, dismissing the action without prejudice to the right of the plaintiffs to raise the same issues in an appropriate case on the authority of the Younger v. Harris group of cases. That is the order appealed from.
 
 
 16
 The July 21, 1971 order was entered prior to and without the benefit of Judge Van Dusen's exegesis for this court of Younger v. Harris and its companion cases in Lewis v. Kugler, 446 F. 2d 1343 (3d Cir. 1971), and without the Supreme Court's refinement of the issues of jurisdiction and federalism in Mitchum v. Foster, 407 U.S. 225, 92 S. Ct. 2151, 32 L.Ed.2d 705 (1972). Since the district court did not reach the merits it had no occasion to consider whether McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), which deals with another aspect of Pennsylvania Juvenile Court procedures casts any greater light upon the fourteenth amendment issues presented by those proceedings than did In re Gault, supra, and In re Winship, supra.
 
 
 17
 Although the case comes before us with a full record, the absence of findings of fact by the district court precludes us from reaching the merits of this class action. We are presented only with the alternatives of an affirmance if we conclude that the complaint was properly dismissed or a remand for appropriate findings.
 
 
 18
 The broad class action determination quoted above placed before the court claimants in these categories:
 
 
 19
 1. Philadelphia juveniles who have not been, but in the future will be, subjected to the intake procedures complained of. As to any specific Philadelphia juvenile it may be said that the likelihood of his being subjected to the intake procedures is so remote as to be speculative. It is a virtual certainty, however, that some Philadelphia juveniles will be subjected to the intake procedures. Thus it is a virtual certainty, not a matter of speculation, that there are some members of the class against whom no actual proceeding is pending but who will be subject in the future to the intake procedures.
 
 
 20
 2. Philadelphia juveniles who have been subjected to the intake procedures and the detention and interrogation which those procedures entail, and who have been discharged without formal petitions being filed against them. These fall back into category 1, but with the added disability that if they are again subjected to the intake procedures their prior processing may be known to the probation officer administering the intake.
 
 
 21
 3. Philadelphia juveniles who have been subjected to the intake procedures, against whom petitions for their adjudication as delinquents have been filed, who have proceeded to a hearing, and whose hearing terminated in an adjudication that they were not delinquent.
 
 
 22
 4. Philadelphia juveniles who have been subjected to the intake procedures, against whom petitions have been filed, who have proceeded to a hearing, and whose hearing is still pending.
 
 
 23
 5. Philadelphia juveniles who have been subjected to the intake procedures, against whom petitions have been filed, who have proceeded to a hearing, and who have been adjudicated delinquent.
 
 
 24
 Conover, the original plaintiff, was adjudicated on one of the three petitions pending against him and discharged on the other two. Thus he is in category 5 above. As to Myers, the intervenor, a demurrer was sustained to the petition against him and he was discharged. Thus he is in category 4 above. Since both had been subjected to the intake procedures, and both ran the risk of being subjected to them in the future, they were pressing claims in which they had a concrete interest in an adversary context. The district court recognized as much both when it refused to grant the original motion to dismiss the complaint and when it found them to be adequate class representatives for a class encompassing all five categories of claimants.
 
 
 25
 Of the five categories of claimants, only those in category 4 are literally claimants against whom a state proceeding is pending. Thus assuming, without deciding, that juvenile court proceedings should be equated to the state criminal prosecutions pending in Younger v. Harris and its companion cases, only that limited category of claimants should have been affected by those cases. The district court held, nevertheless, that those cases mandated a dismissal as to the entire class. It reasoned:
 
 
 26
 "The procedure challenged affects persons only when they are brought into the juvenile court process. When this process has begun, the Younger and Samuels cases say, the federal courts must not interfere. . . . What plaintiffs' argument really means is that the named plaintiffs are no longer proper representatives of the class.
 
 
 27
 Plaintiffs argue that this action may nevertheless proceed with some redefinition of the class. I disagree. As to those persons who are now in the juvenile intake process and those who will be in the future, the principles set forth in the cited cases clearly apply. As to those who have been through the juvenile process, the issues presented in this case are either moot (if the proceedings were terminated in favor of the juvenile) or they can be raised in federal court only through a petition for a writ of habeas corpus. Under the latter procedure, state remedies must be exhausted before the federal courts may pass on the merits of the constitutional claim. 28 U.S.C. Sec. 2254(b)." 328 F. Supp. at 995.
 
 
 28
 Almost all of this reasoning is inconsistent with our subsequent decision in Lewis v. Kugler, supra. Since the decision of the Supreme Court in Mitchum v. Foster, supra, our conviction that Lewis v. Kugler was correctly decided has been reinforced. From those cases, from the Younger v. Harris group of cases and from other relevant authorities these rules of general application may be deduced:
 
 
 29
 A. When an action is brought under the Federal Civil Rights Acts raising federal constitutional claims, prior resort to the state courts, even where there may be an available state remedy, is not required. E.g., Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). There is no doctrine of exhaustion of state remedies applicable to the federal courts' jurisdiction under 28 U.S.C. Sec. 1343. E.g., Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam); McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir.), cert. granted sub nom. Oswald v. Rodriguez, 407 U.S. 919, 92 S. Ct. 2459, 32 L.Ed.2d 805 (1972).
 
 
 30
 B. The Civil Rights Act of 1871, 42 U.S.C. Sec. 1983, is an express exception to the anti-injunction statute, 28 U.S.C. Sec. 2283, Michum v. Foster, supra; Cooper v. Hutchinson, 184 F.2d 119 (3d Cir. 1950). Thus the pendency of a state court proceeding does not deprive a federal court of equity of jurisdiction to issue an injunction in cases brought on the authority of 42 U.S.C. Sec. 1983.
 
 
 31
 C. A federal court may as a matter of discretion abstain in favor of an available state court adjudication if there is an unresolved question of state law which only the state courts can authoritatively construe and which may by virtue of such an authoritative construction avoid the decision of a federal constitutional issue.[2] For convenience we refer to such abstention as Pullman[3] type abstention. Such abstention involves no decision on the merits of the claim or even on the appropriateness of injunctive relief and is availed of as a device whereby a federal court may avoid a premature decision of a federal constitutional issue.
 
 
 32
 D. Weighed against the undesirability of a premature decision of the federal issue is the mandate from Congress in the Civil Rights Acts passed pursuant to the fourteenth amendment that federal courts will afford a prompt remedy for violations of that amendment and that such remedy includes federal fact finding.[4] See Mitchum v. Foster, supra. Thus, if abstention in face of a state court adjudication would be likely to cause delay or if the evidentiary and ultimate facts on which the fourteenth amendment claims depend are in dispute the federal court should exercise its discretion against Pullman type abstention.
 
 
 33
 E. In determining whether or not, in a case in which it has undoubted power to act, a federal court should on equitable principles enjoin a state court criminal prosecution, the federal equity court must take into account the available remedy at law of raising the federal constitutional claim in the pending state proceeding. That available remedy at law in the state court, when weighed with the comity due to a court of a coordinate sovereignty, will, in the absence of additional exceptional circumstances, always militate against the issuance of an injunction halting or interfering with the state prosecution. For convenience we refer to this rule as Younger type nonintervention. It is not abstention in the Pullman sense because it involves a decision on the merits of the claim for equitable relief that there is an adequate remedy at law in the state courts and that therefore federal equitable relief is inappropriate. The issue is not one of power or jurisdiction in this instance but simply of the appropriateness of equitable relief.
 
 
 34
 F. When the issuance of a declaratory judgment will have the same practical effect on a pending state prosecution as the issuance of an injunction, the same Younger considerations govern the appropriateness of that relief. Samuels v. Mackell, supra.
 
 
 35
 G. Even if a state prosecution is pending, injunctive or declaratory relief against state officers with respect to violations of federal constitutional rights not amounting to an injunction which will halt or substantially interfere with a pending prosecution may still be available. Lewis v. Kugler, supra at 1349. The award of either declaratory or injunctive relief may not present any problem of the comity due to a court of a coordinate sovereignty and will be governed by general legal or equitable considerations. If the requested declaratory relief against state officers would, however, adjudicate an issue such as the lawfulness of a search and seizure which on the basis of collateral estoppel might affect the state prosecution, then the federal court should not grant such relief. See Id.
 
 
 36
 H. The exhaustion requirement of the habeas corpus statute, 28 U.S.C. Sec. 2254(b), does not apply to proceedings brought under 28 U.S.C. Sec. 1343 and 42 U.S.C. Sec. 1983. Until the state court proceeding produces a judgment of the state courts resulting in confinement, 28 U.S.C. Sec. 2254(b) does not apply by its terms even to federal habeas corpus jurisdiction. It is simply not relevant to the Civil Rights Act. Wilwording v. Swenson, supra; Rodriguez v. McGinnis, supra.
 
 
 37
 The district court decision did not correctly apply these rules. First, it assumed that the Younger principle applied to those class members against whom an actual proceeding had not yet commenced. As we made clear in Lewis v. Kugler, supra, that principle operated only against those persons then actually enmeshed in the toils of a state criminal proceeding. Next, it assumed that the exhaustion requirement of 28 U.S.C. Sec. 2254(d) was in some manner applicable to an action brought under 42U.S.C. Sec. 1983. As to those class members who have not yet been confined as a result of a state court judgment, 28 U. S.C. Sec. 2254(d) is inapplicable by its terms. As to those class members who are confined as a result of a judgment finding them to be delinquent, there is no authority which warrants engrafting the requirements of 28 U.S.C. Sec. 2254(d) upon an action brought pursuant to 42 U.S.C. Sec. 1983. Wilwording v. Swenson, supra; Rodriguez v. McGinnis, supra.
 
 
 38
 The district court acted solely on the authority of Younger v. Harris, supra, and Samuels v. Mackell, supra. Thus we are not aware of that court's views as to the substantiality of the fourteenth amendment claims alleged on behalf of the class as to the possibility of a construction by the Pennsylvania courts of Pa.Stat.Ann. tit. 11, Sec. 246 which would avoid a decision on those claims, or as to the availability of any Pennsylvania procedure which would provide the opportunity for such a construction. On the record before us, the original and the intervening plaintiffs have been processed through the Family Court Division of the Philadelphia Court of Common Pleas apparently without any opportunity to obtain an adjudication of their claims with respect to the intake procedures. Assuming the legal sufficiency of the petition that they be adjudged delinquent, and assuming the sufficiency of the evidence of their delinquency, we know of no Pennsylvania procedure whereby they may test the legality of the steps leading to a decision to file a formal petition against them. Such a procedure may exist, but it has not been called to our attention. Nor have the defendants called to our attention any civil remedy, outside the scope of the Pennsylvania Juvenile Court Act, by which the class members might obtain a construction of the Pennsylvania statute which would avoid a decision by the federal courts on the fourteenth amendment claims. Moreover, defendants have suggested no likely construction of Pa.Stat.Ann. tit. 11, Sec. 246 (1965) which would avoid the claim that the probation officers in the intake process exercise virtually unbridled discretion. In such circumstances we may not, on the appellate level, affirm on the basis of a Pullman type abstention which the district court did not consider. At the same time, since the district court made no findings of fact, we cannot at this stage of the case rule out the possible propriety of such an exercise of the district court's discretion.
 
 
 39
 However, even if a Pennsylvania remedy exists, the district court cannot abdicate its responsibility as an article III court to determine facts which are of constitutional significance. Even with Younger type nonintervention the federal court must make the factual determination whether extraordinary circumstances exist which would take the case outside the ordinary rule that the state remedy at law is adequate. As Justice Holmes noted:
 
 
 40
 "[T]he determination as to their rights turns almost wholly upon the facts to be found. . . . When those are settled the law is tolerably plain. All their constitutional rights we repeat, depend upon what the facts are found to be. They are not to be forbidden to try those facts before a court of their own choosing, if otherwise competent." Prentis v. Atlantic Coast Line, 211 U.S. 210, 228, 29 S.Ct. 67, 70, 53 L.Ed. 150 (1908).
 
 
 41
 The purpose of Congress in enacting the Civil Rights Acts was to provide a federal forum for the enforcement of federal rights. See Mitchum v. Foster, supra, 407 U.S. at 241, 92 S.Ct. 2151. Where an adjudication of those rights rests heavily on a factual determination, the ultimate responsibility for making this determination lies with the article III courts.
 
 
 42
 There is in the district court's opinion the suggestion of mootness. This suggestion is erroneous. Completion of the juvenile court proceedings did not remove Conover and Myers from membership in the class defined in the order which made the class action determination. They still were juveniles in Philadelphia who might in the future be subjected to the challenged intake procedures. They continued to press their objections to that procedure in an adversary context. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970). Indeed, even if their own claims had become moot, and they had not, see, e.g., Sibron v. New York, 392 U.S. 40, 50-58, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968); Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); numerous class members remained whose claims were very much alive. See Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). Conover and Myers remained adequate representatives of the entire class. See Gatling v. Butler, 52 F.R.D. 389, 395 (D.Conn. 1971); Adens v. Sailer, 312 F.Supp. 923 (E.D.Pa. 1970).
 
 
 43
 Finally there is the narrow issue whether, even as to class members actually before the Family Court Division of the Philadelphia Court of Common Pleas, the ruling in Samuels v. Mackell, supra, would preclude declaratory relief of some kind. Lewis v. Kugler, supra at 1349, is relevant here. That case suggests that if an actual proceeding is pending, as to those class members against whom those proceedings are pending certain types of declaratory relief will be inappropriate. It holds that the federal court should not foreclose the merits of the issue of legality of a search or seizure by granting a declaratory judgment. Such a determination would in effect substitute federal court fact finding for that already available in the state court on an issue going to the ability of the state to prove its charge. See e. g., Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951). This case does not present the same kind of issue. Declaratory relief with respect to the intake procedures will not necessarily hinder the eventual adjudicatory process of the Court of Common Pleas or substitute federal fact finding in any case in which a petition for adjudication of delinquency may be tried. Thus Lewis v. Kugler, supra, is not authority for the withholding of declaratory relief, even as to those class members presently before the Pennsylvania courts. In that case we pointed out that in the exercise of its broad equitable powers, a district court could fashion a remedy which would prevent deprivation of constitutional rights while at the same time avoiding unnecessary encroachment on state and local government functions, 446 F.2d at 1351-1352. Since a remedy with respect to the intake procedures would not necessarily interfere with the adjudication functions of the Commonwealth's juvenile court, it is therefore not necessarily precluded by Younger v. Harris, supra, or Samuels v. Mackell, supra.
 
 
 44
 If the district court was in error in rejecting the defendant's claims to judicial immunity, 304 F.Supp. at 262, we would be required to affirm the dismissal of the complaint on that basis even though we did not agree with the grounds on which the court acted. See Riley Co. v. Commissioner, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940); Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937). Thus it is appropriate to comment that we agree with Judge Fullam's interpretation of Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966), which distinguishes, for purposes of judicial immunity, actions for damages from actions for injunctive relief.[5] Our leading case of Cooper v. Hutchinson, supra, was an action for an injunction against a state court judge. It was neither limited nor overruled by Bauers v. Heisel, supra. See also Mitchum v. Foster, supra. Compare Bethea v. Reid, 445 F.2d 1163 (3d Cir. 1971) with Cooper v. Hutchinson, supra; cf. Magaziner v. Montemuro, 468 F.2d 782, 788 n. 5 (3d Cir. 1972).
 
 
 45
 The case will be remanded to the district court for findings of fact and conclusions of law. The parties have suggested at oral argument that because of some procedural changes in the intake procedures of the Family Court division of the Philadelphia Court of Common Pleas it may be appropriate to supplement the record. Our ruling does not preclude such action if the district court concludes that it is appropriate. If the district court concludes that what we have referred to as Pullman type abstention is appropriate it should inform us what possible narrowing constructions of the Pennsylvania Juvenile Court Law have been suggested, how these constructions would avoid the decision of the fourteenth amendment claims asserted on behalf of the class and what Pennsylvania procedure is available to class members for raising the issues. If it concludes that such abstention is inappropriate it should proceed to the merits of the fourteenth amendment claims, under the Pennsylvania Juvenile Court Law as applied and to the fashioning of an appropriate remedy if any is found to be necessary, consistent with the principles set forth in this opinion.
 
 
 46
 ADAMS, Circuit Judge (concurring).
 
 
 47
 Since the beginning of our constitutional history, the scope of authority properly exercisable by federal courts of equity has been circumscribed by a policy generally inhibiting interference with state criminal proceedings.[1] Resting upon principles of equity jurisprudence and federal-state comity, this policy of non-intervention posits the existence of dual sovereignties in our system of government and recognizes the value in permitting each to perform its own separate functions without interference from the other. This fundament forecloses a federal court from acting, except in narrow circumstances, to enjoin state criminal proceedings when the plaintiff has an adequate remedy at law and will not suffer irreparable harm as a result of federal court inaction.
 
 
 48
 Requiring, in part, a determination of the contours of this policy of federal non-intervention, the present case may be thought to implicate basic values of our constitutional scheme of government and thus to require a sensitive adjudicative touch. In resolving the issues raised, we must be mindful that our judicial power extends only to deciding the specific case presented to us. While attempting to maintain the essential role of federal courts both in preserving a healthy relationship between the nation and the states and in protecting constitutional rights, the federal judiciary must be alert to the dangers inherent in deciding cases more broadly than required by the precise issues presented. The goal must be reasoned, principled results based solely upon grounds necessary to the disposition of the controversy.
 
 
 49
 Since the majority opinion may be thought to stand for more than the narrow decision appropriate in light of the facts of this case, I feel constrained, in concurring in the result, to state the reasons for my position.
 
 
 50
 This suit was brought in the federal district court on April 8, 1969. On September 24, 1969, the district court, in an opinion and order relying upon the Supreme Court's decision in Zwickler v. Koota,[2] rejected the argument that it should abstain, and instead denied defendants' motion to dismiss the complaint. It permitted the suit to proceed as a class action and, after extensive pre-trial preparation, held a hearing on the merits on April 13, 1971.
 
 
 51
 Prior to the district court hearing, the Supreme Court had handed down, on February 23, 1971, a series of cases defining in some detail the authority of federal courts to enjoin, or to issue a declaratory judgment effectively terminating, pending state criminal proceedings.[3] On the basis of those decisions, the district court concluded that it was interdicted from granting the declaratory or injunctive relief requested by the plaintiffs, and dismissed the complaint on July 12, 1972. Whether that dismissal was improper is the question this Court must now decide.
 
 I.
 
 52
 Before analyzing the applicability of the recent Supreme Court cases limiting federal equity power, it is appropriate to state the reasons for my agreement with the majority's position that this controversy is not moot and can properly be maintained by the named plaintiffs.
 
 
 53
 For 180 years, the federal courts, powerless to issue advisory opinions,[4] have decided only those questions affecting the rights of litigants before them. Federal judicial power exists to adjudicate only those cases that are "definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."[5] A jurisdictional concept,[6] the requirement that federal courts not decide moot cases serves to keep the exercise of federal judicial power within constitutional bounds.
 
 
 54
 The standing doctrine seeks to insure that the parties before the court have sufficiently adverse interests in the outcome of the litigation so that the issues will be fully, adequately, and concretely presented.[7] Although closely related, the mootness concept and the standing doctrine often reflect different concerns. Mootness raises the question whether the litigation itself is of such a character as to fall within the "case or controversy" limitation imposed upon the judicial power of Article III of the Constitution, whereas standing tests whether the particular litigant is the proper party to raise the issues involved.
 
 
 55
 In cases of the kind presented here, the mootness concept and the standing doctrine are often difficult to separate. For example, because the named plaintiffs are not presently being subjected to the procedure they claim to be unconstitutional, it might be argued that, as to them, the case is moot. Neither declaratory nor injunctive relief could correct the alleged past wrong. At the same time, it might be contended that the named plaintiffs lack standing to challenge the Pennsylvania procedure of detaining juveniles without a prompt preliminary hearing on probable cause, because the asserted wrong is past and only a presently detained juvenile would be a proper party to litigate the issue.
 
 
 56
 Whichever contention is pressed-mootness or standing-each is predicated, in this particular case, on the ground that this suit, looking solely to future relief, is not properly maintainable since the named plaintiffs have suffered only a past wrong. These arguments are without merit to the extent they overlook that this suit is a class action, as the district court permitted, on behalf of "all juveniles in Philadelphia, Pennsylvania, who have been or will be affected by action of the defendants alleged in the complaint."
 
 
 57
 In Washington v. Lee,[8] for example, Negro citizens brought a class action seeking a declaratory judgment and injunction against Alabama officials concerning their rights, and those of others similarly situated, not to be segregated by the state penal system. Although the named plaintiffs were in jail when the complaint was filed, they had been released by the time of trial. In answer to the defendants' argument that the named plaintiffs lacked standing to challenge the Alabama statutes and practices involved, the three-judge federal district court first noted that another court had stated in a similar case[9] that to have standing plaintiffs must show past use and a right to and a reasonable possibility of future use of the facilities in question. Instead of following that rule, the three-judge court held that, as to future use, the named plaintiffs did not have to demonstrate an intention to violate the law in such manner as to subject themselves in the future to imprisonment. The three-judge court held that to acquire standing, the plaintiffs must show that the operation of the jails " 'permit[s] the recurrence of comparable violations.' "[10] The Supreme Court affirmed per curiam.[11]
 
 
 58
 Analyzing a similar question in terms of the mootness concept, not the standing doctrine, another court has come to the same conclusion. In Gatling v. Butler,[12] plaintiff, an indigent juvenile, sought review of her delinquency adjudication, but was prevented by defendants, state officials, who would not docket the appeal without payment of a filing fee as required by Connecticut statute. Alleging that application of the statute deprived her and others similarly situated of equal protection and due process, the plaintiff requested the convening of a three-judge district court to determine her case on the merits and asked for injunctive and declaratory relief. The court was informed that a state court hearing had been scheduled for consideration of plaintiff's earlier application for waiver of filing fees. It therefore reserved decision pending outcome of the state court hearing. When the state court later granted plaintiff leave to file her appeal without payment of the filing fee, defendants urged the district court to dismiss the complaint on the ground, inter alia, that the state court had eliminated any controversy. The court held that the suit was not moot as to other class members even on the assumption that plaintiff's own case was moot,[13] and that the named plaintiff could continue to litigate the issues as representative of the class.
 
 
 59
 Thus, whether the present case is analyzed in terms of mootness or standing, the result is the same: it is properly maintainable by the named plaintiffs, if, as will be discussed infra, they are not otherwise barred by the doctrine enunciated in the Younger line of cases.
 
 
 60
 Even assuming that the case is moot as to the named plaintiffs, as the district court suggested, mootness as to them does not necessarily imply mootness as to the class represented.[14] Indeed, at least as to some members of the class-those picked up and detained but who have not yet been discharged or given a preliminary or adjudicative hearing-it is clear that there is a "real and substantial controversy," "touching the legal relations of parties having adverse legal interests."[15] Under these circumstances, the case is not moot and may properly be maintained by the named plaintiffs at least as class representatives.[16]
 
 II.
 
 61
 Federal injunctive relief as a remedy for alleged unconstitutional action by state officials is neither novel nor noteworthy. In Ex Parte Young,[17] a federal court, having preliminarily enjoined railroads from complying with a Minnesota statute reducing their rates, adjudged Young, the state attorney general who had been enjoined from enforcing the statute, in contempt after he filed a state court petition to order the railroads to conform to the statute. The Supreme Court affirmed the judgment of contempt, holding that the suit was not barred by the 11th Amendment. It did not question the existence of federal power to enjoin a state official.
 
 
 62
 The legislative response to the apparent shift in the distribution of power between nation and state wrought by Ex Parte Young included the enactment of statutory curbs upon the scope of federal jurisdiction.[18] Not all limitations on federal judicial power, however, came from the Congress. The courts themselves began to develop self-imposed limitations on the exercise of federal power to enjoin state officials.
 
 A. The Abstention Doctrine
 
 63
 Railroad Commission v. Pullman Co.,[19] though perhaps not the birthplace of the abstention doctrine, is at least the case that secured its foundations. In an action to enjoin an order of the Texas Railroad Commission that sleeping cars must be in the charge of conductors (white) not porters (black) as unauthorized by Texas law and as violative of the equal protection, due process, and commerce clauses of the Constitution, Mr. Justice Frankfurter, speaking for a unanimous Court, held that the district court should have exercised its equity discretion and abstained. First, because the case touched "a sensitive area of social policy" and because decision of constitutional questions should be avoided if possible, the Court thought it best for such cases to be decided on the basis of the state law questions involved "if a definitive ruling on the state issue would terminate the controversy."[20] Second determination by the federal court of the state law question would be unwise: "[N]o matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination."[21] However, the court noted another factor of importance:
 
 
 64
 "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies. . . ."[22]
 
 
 65
 As a technique for refusing to exercise federal jurisdiction when the case's result might turn on issues of state law, the abstention doctrine rests fundamentally upon a reluctance to decide avoidable, federal constitutional questions. Of course, a policy of eschewing unnecessary constitutional decisions cannot by itself justify abstaining. Instead, when underlying and determinative state law issues are present, the federal court could satisfy the policy of avoiding constitutional decision by deciding the case itself on the basis of state law.[23] That federal courts are not inherently powerless or incompetent to resolve state law issues is clear: in diversity cases, for example, they must often do so.[24] But, because of the presence of state law questions, the fact that a federal decision regarding them cannot be determinative, and the kind of disruption that an erroneous federal decision pertaining to state law may cause to state policy, federal abstention in favor of at least a preliminary state court adjudication is justified.
 
 
 66
 Application of the abstention doctrine, however, must be predicated upon the presence of a state law question capable of making constitutional decision unnecessary.[25] The absence of such a state law question in the present case precludes refusing to adjudicate this controversy on abstention grounds.
 
 
 67
 Unlike the Pullman case, where the authority of the Railroad Commission under Texas law to issue the challenged order was unclear, here there is little question regarding the authority as a matter of Pennsylvania law to detain juveniles during the intake process without a preliminary hearing on probable cause. Pennsylvania explicitly prohibits preliminary hearings in juvenile proceedings.[26] Under these circumstances, a state court decision would not render unnecessary a determination of the federal constitutional issue raised by plaintiffs. And, as the cases make clear, abstention is not justified solely to afford the state courts an opportunity to pass upon the federal constitutional question presented.[27]
 
 
 68
 B. Strict Adherence to Prerequisites of Equity-The Younger Line of Cases
 
 
 69
 In addition to developing the abstention doctrine to counteract to some degree the shift in federal-state relations threatened by the implicit rationale underlying Ex Parte Young, the federal courts have taken special precautions, in suits to enjoin state officials, to insure that federal interference occur only when necessary to protect the plaintiff's rights. To determine whether the exercise of equitable power is necessary, the courts have focused upon whether the plaintiff has an adequate remedy at law and whether he will suffer irreparable injury as a result of federal court inaction.
 
 
 70
 When requested to interfere with state criminal proceedings, the federal courts have been particularly strict in applying equity requirements. In Douglas v. City of Jeannette,[28] for example, petitioners, members of Jehovah's Witnesses, brought suit in federal court to restrain threatened state prosecution of them for violating a city ordinance prohibiting the solicitation of orders for merchandise without first obtaining a license and paying a license tax. The Supreme Court held that the district court, in the exercise of its equity powers, should not "interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent. . . ."[29]
 
 
 71
 In the circumstances of that case, the Court found no irreparable injury.
 
 
 72
 "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guarantees, is not a ground for equity relief since the law fulness or constitutionally of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction.[30]
 
 
 73
 ******
 
 
 74
 * * *
 
 
 75
 "It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court.[31]
 
 
 76
 The Supreme Court has recently re-affirmed the principle of Douglas regarding federal interference with state criminal proceedings. In Younger v. Harris,[32] Harris was charged in a state court with violating the California Criminal Syndicalism Act. He then filed suit in a federal district court alleging that the prosecution and the existence of the California statute "chilled" his First Amendment rights, and asked that the district attorney be enjoined from prosecuting him. A three-judge district court issued the requested injunction, after holding that it had authority to restrain the district attorney and that the statute was void for vagueness and overbreadth. The Supreme Court reversed the judgment "as a violation of the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances."[33] In the companion case of Samuels v. Mackell,[34] the Court held that the same rule applies to declaratory judgment actions.
 
 
 77
 Revealing a deep concern for federal-state relationships and the delicacy with which cases requesting federal interference with pending state criminal proceedings must be handled, the Younger decision "rests on the absence of the factors necessary under equitable principles to justify federal intervention . . . ."[35] As the Supreme Court asserted:
 
 
 78
 "[the] longstanding public policy against federal court interference with state court proceedings . . . . [rests in part upon] [t]he basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."[36]
 
 
 79
 The Court found neither of these equity prerequisites present in Younger. An adequate legal remedy was available in the pending state criminal proceeding where Harris would be able to raise his constitutional claims by way of defense. In addition, denial of federal equitable relief would not, in the Court's view, cause Harris irreparable injury which, for purposes of cases requesting federal interference with state criminal proceedings, the Court defined as having to be " 'both great and immediate.' "[37]
 
 
 80
 " 'No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.' "[38]
 
 
 81
 ******
 
 
 82
 * * *
 
 
 83
 " 'It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith . . . .' "[39]
 
 
 84
 As will become apparent, plaintiffs have here presented a case sufficiently distinguishable from the Younger series of cases so as not to require the same result.[40]
 
 
 85
 Both Younger and Samuels presented factual situations in which defendants in criminal cases were each attempting to attack the constitutionality of the statute upon which his state prosecution was based.[41] In both these cases, because the constitutional challenge was to the very law forming the basis for prosecution, declaratory or injunctive relief, resting upon a holding of unconstitutionality, would effectively have brought the pending state criminal proceeding to a halt. In each of the Younger series of cases, the interest of the state in prosecuting criminal proceedings without interference would have been seriously frustrated by the requested federal court action.
 
 
 86
 At the same time, in none of the Younger line of cases would federal court interposition have produced a corresponding, appreciable gain for the protection of federal constitutional rights. Younger, Samuels, and Perez v. Ledesma each presented situations in which the prosecuted parties could raise their constitutional assaults during the course of their pending state criminal trials. Moreover, in Boyle v. Landry, none of the plaintiffs had been prosecuted, charged, or even arrested under the particular statute they were challenging.[42]
 
 
 87
 The present case, on the other hand, produces a significantly different factual pattern.
 
 
 88
 First, no one is here attacking the constitutionality of the statute forming the basis for the delinquency proceeding, itself. Plaintiff Conover, for example, is not urging that assault and battery cannot constitutionally be made a delinquency violation or crime, nor is he praying for injunctive or declaratory relief against a pending delinquency adjudication.[43] Rather, plaintiffs are here attempting to secure only a federal court judgment that holding juveniles without a preliminary hearing or an equivalent proceeding to ascertain probable cause is unconstitutional.[44] Under these circumstances, a federal court's declaration of unconstitutionality or an injunction requiring the officials to institute a preliminary hearing procedure would in no way adversely affect the state's legitimate interest in conducting its delinquency hearings without direct interference. No delinquency hearings would be enjoined. Indeed, the sole effect of giving plaintiffs the relief they seek would be a requirement that, in the future, preliminary hearings or an equivalent proceeding to determine probable cause be held. Simply put, the state would no longer be permitted to detain juveniles without a determination of probable cause for such detention.
 
 
 89
 The foregoing view, that plaintiffs in the present case are not requesting the kind of federal interference proscribed by Younger and Samuels, is supported by this Court's recent decision in Lewis v. Kugler.[45] There, plaintiffs brought suit under Sec. 1983 on behalf of themselves and all others similarly situated and alleged that while travelling upon New Jersey highways, they had been subjected to arbitrary stops and unreasonable searches by state policemen. They sought, inter alia, a declaration that the alleged practice of selective searches is unconstitutional and an injunction against its continuance. At the time suit was filed, ten of the thirtyseven named plaintiffs were subject to pending state criminal proceedings.
 
 
 90
 Dealing with the recent Younger line of cases, the Court first noted that they "are pertinent . . . only insofar as the complaint seeks relief in the nature of an injunction against state criminal proceedings or declaratory relief which would interfere with state criminal proceedings."[46] Because the ten plaintiffs being prosecuted would have an opportunity to raise their constitutional claims in the state proceedings, the Court denied an injunction against prosecution and "a declaratory judgment that the searches and seizures forming the basis of the state criminal proceedings against the 10 are unconstitutional . . . ."[47] The Court also held, however, that the federal district court could consider the claims of the ten plaintiffs being prosecuted, along with the claims of the other plaintiffs, in determining whether the practice of selective searches was unconstitutional.
 
 
 91
 "This case differs from Samuels, however, in that the 10 plaintiffs being prosecuted, in addition to seeking relief against the prosecutorial authorities, also seek relief against the New Jersey State Troopers. As we have noted, that relief is not barred by the Younger and Samuels line of cases . . . ."[48]
 
 
 92
 Lewis v. Kugler, then recogizes that the principle of Younger and Samuels applies when the relief sought is against a pending state criminal prosecution. The Court permitted relief by those being prosecuted to the extent such relief would not interfere with pending criminal proceedings. The effect of granting equitable relief in the present case, as in Lewis v. Kugler, will not seriously interfere with or terminate any state adjudications of delinquency.
 
 
 93
 That equitable relief is not here barred by the Younger line of cases does not imply, of course, that the plaintiffs are necessarily entitled to an injunction or a declaratory judgment.[49] Determining the propriety of granting or denying such relief in this case depends upon whether plaintiffs have an adequate remedy at law and whether they will suffer irreparable harm in the absence of a federal equity court's aid. Because the present record is inadequate to enable this Court to make such a determination, I agree with the majority's conclusion that this case should be remanded to the district court for findings of fact and conclusions of law.
 
 
 94
 The district court may well find, for example, that state habeas corpus[50] or declaratory relief is available and adequate to provide a determination of the constitutional claims presented here. Although the availability of relief in the state courts does not, in Sec. 1983 suits, preclude federal court action on exhaustion grounds,[51] such procedures may constitute the "adequate remedy at law" barring equitable relief. Moreover, a Sec. 1983 suit for damages in the federal court may or may not be "adequate" to satisfy the claim of plaintiffs and the class they represent.[52]
 
 
 95
 In view of the circumstances presented here, this case should be remanded to the district court. If that court decides that plaintiffs have an adequate remedy at law or will not suffer irreparable harm as a result of federal court inaction, dismissal of the case would be in order. On the other hand, if the necessary equity factors are demonstrated, the district court should proceed to adjudicate the matter and award, if plaintiffs prevail on the merits, appropriate relief.[53]
 
 
 96
 Before SEITZ, Chief Judge, and McLAUGHLIN, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN and HUNTER, Circuit Judges.
 
 
 97
 OPINION OF THE COURT SUR PETITION FOR REHEARING
 
 
 98
 ADAMS, Circuit Judge.
 
 
 99
 Honorable Frank M. Montemuro, Jr., Administrative Judge of the Family Court Division of the Philadelphia Court of Common Pleas, has petitioned for a rehearing by the Court en banc of several issues involved in the panel's previous disposition of this appeal.[1]
 
 
 100
 Having reviewed the contentions pressed by the petition for rehearing, the opinions previously filed by the panel are hereby reinstated except for those portions of the majority opinion discussing the doctrine of judicial immunity in the context of a Sec. 1983 suit for injunctive relief.[2] This disposition in no way implies any view concerning the applicability of the judicial immunity doctrine in injunctive suits under 42 U.S.C. Sec. 1983, but merely reflects the conclusion of this Court that, in the circumstances of the present case, the prudent employment of judicial power counsels withholding a definitive judgment upon this issue at the present time.
 
 
 101
 The district court held that Judge Montemuro is a proper party defendant to the injunctive aspect of this action.[3] In his petition for rehearing Judge Montemuro conceded-at least for the purpose of this appeal-that the judicial immunity doctrine creates no per se bar to a federal court's enjoining a state court judge.[4]
 
 
 102
 Mindful of the various views on this issue,[5] we decline to pass judgment at this time upon whether the judicial immunity doctrine is an absolute bar, a partial bar, or no bar at all in Sec. 1983 suits for injunctive relief against state court judges. To do otherwise in the present appeal, keeping in mind Judge Montemuro's concession that federal judges possess the power to enjoin state judges, would be to decide an issue not necessary to the disposition of this case, at least at this stage. We do not now, therefore, express any view concerning the district court's ruling upon this issue.
 
 
 103
 Upon an issue of such significance, when to decide is not necessary, it may well be necessary not to decide.
 
 
 104
 GIBBONS, Circuit Judge (concurring in the result).
 
 
 105
 The opinion of the court on appellee's petition for rehearing reaches the correct result. I concur in that result and in the reinstatement of those portions of the majority opinion heretofore filed of which the opinion of the court on appellees' petition for rehearing approves. I do not concur, however, in the express reservation of approval of that part of the majority panel opinion which dealt with the contention that state court judges are immune from federal injunctive relief. That reservation, in the context of this case, is unfortunate since it serves to introduce elements of uncertainty in areas of the law which heretofore were certain, and to create ambiguities for the district court as to the effect of our mandate on remand. The introduction of these uncertainties and ambiguities in an opinion disposing of the petition for rehearing is entirely unwarranted, since that petition did not address itself to the immunity issue. Thus, the majority has chosen the vehicle of an opinion on a petition for rehearing on other issues to act sua sponte in expressing its reservations about that part of the panel opinion dealing with immunity. That the majority would so far depart from the normal practice of this court can only lend substance and respectability to positions on the now uncertain areas of the law which, at least to me, were heretofore insubstantial and unrespectable.
 
 
 106
 The first area of the law to which uncertainty has been introduced is that of appellate procedure. The judgment appealed from dismissed the plaintiffs' complaint.
 
 
 107
 "In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason."[1] Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937).
 
 
 108
 Compare Law Students Civil Rights Research Council, Inc., v. Wadmond, 401 U.S. 154, 158 n. 9, 91 S.Ct. 720, 27 L.Ed. 2d 749 (1971), in which the Supreme Court declined to examine the judicial immunity doctrine. In Wadmond, an injunction had been entered against the appellee-defendants, who did not file a cross-appeal when the plaintiffs appealed. Thus the appellees in Wadmond were barred on appeal from attacking on immunity grounds an injunction against them from which they did not appeal. They ran afoul of another equally well settled rule that a party who is not satisfied by a final judgment cannot be heard in opposition thereto when his adversary appeals unless he has filed a cross-appeal. Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 57 S.Ct. 325, 81 L.Ed. 593 (1937). A nonappealing party in other words, may not attack a judgment, but may support it by any matter, appearing in the record. These two rules of appellate procedure were placed in a nice juxtaposition by Mr. Justice Brandeis:
 
 
 109
 "[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to ing in the record, although his argusupplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearment may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it." United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924) (Footnote omitted).
 
 
 110
 These rules apply to appeals from the district court to this court as well as to appeals to the Supreme Court. 9 J. Moore, Federal Practice p204.11 at 933 (2d ed. 1972). Under these rules the Supreme Court properly declined to consider the immunity contention which had been rejected by Judge Friendly in the district court. Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 123-124 (S.D. N.Y.1969) (three-judge court.) But under these rules, in considering the judgment dismissing the complaint this court was required to consider whether, even though the grounds relied on by the district court were erroneous, a valid ground for dismissal was presented in the record. The immunity contention was a matter of record. It had, indeed, been rejected in a district court opinion on an interlocutory aspect of the case. Conover v. Montemuro, 304 F.Supp. 259 (E.D.Pa.1969). Acceptance of the immunity doctrine would require an affirmance.
 
 
 111
 Have we now adopted a new set of rules as to when a completely successful appellee must file a cross-appeal? If we have adopted a new set of rules, what is the effect, upon remand, of the failure of a completely successful appellee to cross-appeal? If we have not adopted a new set of rules, what is the intended effect, upon remand, of the majority opinion on rehearing? The ambiguities of the majority opinion leave these matters for resolution by the district court. If that court concludes that we have in fact adopted a new set of rules as to when a completely successful appellee must file a cross-appeal, then it must resolve the issue whether by failing to file a notice of cross-appeal the appellees have made the original district court ruling on immunity res adjudicata. If, on the other hand, it concludes that we have not adopted a new set of rules as to when a notice of cross-appeal must be filed, then it must interpret the basis for the excision of the immunity discussion from the panel opinion. Possibly some sort of waiver is operating against appellees. If so, the district court must determine whether the waiver is for this round of the fight or for the complete bout.
 
 
 112
 So I ask, on behalf of the district judge who must deal with the case on remand, is the immunity contention, which was specially pleaded and never abandoned, still in the case? The question is hardly academic, in view of the majority's sua sponte action in withholding approval of the discussion of that contention.
 
 
 113
 This brings me to the reference in the majority opinion on rehearing to "various views on this issue." The issue is whether state court judges are immune from the compulsory civil process of an injunction of the article III courts. There is no thoughtful opinion, indeed no reasoned analysis, so holding. The majority of this court declines at this time to express a view of the law which recognizes a distinction between judicial immunity from civil liability in damages and immunity from civil process. In fact by declining such expression what it has done is withdraw this court's imprimatur from what was settled law in this circuit.
 
 
 114
 In Allen v. Biggs, 62 F.Supp. 229 (E. D.Pa.1945) (Ganey, J.), the district court recognized that judges of this court could not be sued for money damages for acts done in the performance of their official duties. That case, unlike this, involved a federal judicial officer. It recognized that the privilege of freedom from liability for damages was a matter of common law, but the opinion did not specify whether the source of the privilege was state or federal common law. The same issue came before this court, this time with respect to a state judicial officer sued for money damages, in Picking v. Pennsylvania R. Co., 151 F.2d 240, 250 (3d Cir. 1945). Judge Biggs, the defendant in Allen v. Biggs, supra, held that state court judges were not immune from damage suits brought in the federal courts pursuant to the jurisdiction conferred by the Civil Rights Act of 1870. Recognizing the common law privilege referred to in Allen v. Biggs, he said:
 
 
 115
 "But the privilege as we have stated was a rule of the common law. Congress possessed the power to wipe it out. We think that the conclusion is irresistible that Congress by enacting the Civil Rights Act sub judice intended to abrogate the privilege to the extent indicated by that act and in fact did so." 151 F.2d at 250.
 
 
 116
 In Cooper v. Hutchinson, 184 F.2d 119 (3d Cir. 1950), this court considered an application for injunctive relief against a state court judge for prohibiting an out-of-state attorney from representing a defendant in a capital case. Judge Goodrich recognized that there was equitable jurisdiction in the federal courts to issue such an injunction. Cooper v. Hutchinson, supra, is, of course, most notable for the proposition that the Civil Rights Act of 1870 is an express exception to the Anti-Injunction Act of 1792, a view ultimately adopted by the Supreme Court in Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). But it is also a clear holding that a state court judge is not immune from the civil process of an injunction issued by a federal court.
 
 
 117
 Judge Biggs, in Picking v. Pennsylvania R. Co., supra, proved to be less prophetic than usual, for in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court rejected his construction of the Civil Rights Act of 1870 as abolishing common law privileges. Tenney v. Brandhove, supra, recognized that the common law immunity of legislators from civil liability in damages survived the Civil Rights Act. In Bauers v. Heisel, 361 F. 2d 581 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967), this court recognized that Tenney v. Brandhove, supra, overruled Judge Biggs' construction of the Civil Rights Act, and that Allen v. Biggs, supra, rather than Picking v. Pennsylvania R. Co., supra, was the governing precedent with respect to actions seeking money damages from state court judges. In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court, in a case involving a suit against a state court judge for money damages, reiterated that the Civil Rights Act had not abolished all common law immunities, and that the judge was immune from liability for damages.
 
 
 118
 The vigorous dissent of Justice Douglas, tracing the legislative history of the Civil Rights Act, espouses the construction of that statute announced in the Picking case by Judge Biggs. If I were free to do so I would espouse the same construction, especially since the unwillingness of state judges to enforce the law on behalf of freedmen and loyalists in the post-Civil War years figured so prominently as a motivation for the enactment of the statute. But in our framework of government, history, including legislative history, is what a majority of the Supreme Court chooses to make of it. Thus we are bound by the Pierson v. Ray, supra, construction of the Civil Rights Act.
 
 
 119
 But the holdings of Tenney v. Brandhove, supra, and of Pierson v. Ray, supra, are quite clearly limited to the Picking situation, and do not apply to Cooper v. Hutchinson, supra. The Supreme Court did not either in Tenney or in Pierson, refer to Cooper v. Hutchinson, supra, although for years it had demonstrated its awareness and knowledge of the significance of that case.[2] Neither Tenney nor Pierson mention the injunction problem, and both explicitly refer to the common law as the source of the immunity which they recognize.[3] Thus, the starting point of any discussion of judicial immunity from the civil process of the federal courts must be the common law as of 1870. Here we have rather clear contemporaneous expressions.
 
 
 120
 In Pierson v. Ray, supra, the Court found the common law of judicial immunity in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). The Bradley litigation, of which Bradley v. Fisher, supra, is only one aspect, precisely illustrates the distinction between immunity from civil liability in damages and immunity from coercive civil process. Bradley was the attorney for Dr. Suratt in the criminal case growing out of the assassination of President Lincoln. Fisher was the judge who presided at that trial. Judge Fisher took umbrage at the manner in which Bradley conducted the defense and at the conclusion of the case struck Bradley's name from the roll of the court; Bradley sued Fisher for damages consequent thereon. Justice Field, writing for the Court on the authority of Randall v. Brigham, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1869), held that Judge Fisher could not be made to answer in damages. Randall v. Brigham, supra, had held that judges of a state court could not be held liable for damages for wrongfully disbarring an attorney. That case arose, of course, prior to the enactment of the Civil Rights Act of 1870, so that the Pierson v. Ray, supra, issue was not presented. Taken together, then, Bradley v. Fisher, supra, and Randall v. Brigham, supra, establish that neither federal nor state judges may be held liable in damages for acts in the performance of their judicial duties.
 
 
 121
 But Judge Fisher was not the only judge who had taken umbrage at the way in which Bradley had represented Dr. Suratt. The Supreme Court of the District of Columbia had also disbarred him for his alleged contumacy toward Judge Fisher. Bradley filed in the Supreme Court of the United States a petition for an original writ of mandamus directed to the Supreme Court of the District of Columbia to restore him to the roll of attorneys. Justice Nelson, writing for the Supreme Court, held that the peremptory writ of mandamus should issue to the judges of the Supreme Court of the District of Columbia. Ex parte Bradley, 74 U.S. (7 Wall.) 364, 19 L.Ed. 214 (1868). Thus in the very term in which the Court first recognized the common law immunity of judges from damage actions it also recognized that such immunity had nothing at all to do with those civil processes by which the future conduct of judges was controlled. Ex parte Bradley, supra, relied upon Chief Justice John Marshall's opinion in Ex parte Crane, 30 U.S. (5 Pet.) 188, 8 L.Ed. 92 (1831), which had held that mandamus would issue against a federal circuit judge to compel him to sign a bill of exceptions so that a writ of error might be pursued in the Supreme Court. See also Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Chief Justice Marshall found authority for the issuance of this writ against a judge in Section 13 of the judiciary Act of 1789, 1 Stat. 73. It will be recalled that in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 175, 2 L.Ed. 60 (1803), the Court had held that Sec. 13, to the extent that it attempted to confer original mandamus jurisdiction upon the Supreme Court to entertain suits against nonjudicial officers, was unconstitutional. Ex parte Crane, supra, distinguished mandamus in the exercise of the Court's appellate jurisdiction. Marshall wrote:
 
 
 122
 "That a mandamus to sign a bill of exceptions is 'warranted by the principles and usages of law,' is, we think, satisfactorily proved by the fact, that it is given in England by statute; for the writ given by the statute of Westm.
 
 
 123
 II., is so, in fact, and is so termed in the books. The judiciary act speaks of usages of law generally, not merely of common law. In England, it is awarded by the chancellor; but in the United States, it is conferred expressly on this court, which exercises both common law and chancery powers; is invested with appellate power, and exercises extensive control over all the courts of the United States. We cannot perceive a reason, why the single case of a refusal by an inferior court to sign a bill of exceptions, and thus to place the law of the case on the record, should be withdrawn from that general power to issue writs of mandamus to inferior courts, which is conferred by statute.
 
 
 124
 In New York, where a statute exists, similar to that of Westm. II., an application was made to the supreme court for a mandamus to an inferior court to amend a bill of exceptions, according to the truth of the case. The court treated the special writ given by the statute as a mandamus, and declared, that it was so considered in England; and added, that 'though no instance appears of such a writ issuing out of the king's bench, where an inferior court refused to seal a bill of exceptions, there is no case denying to that court the power to award the writ.' 'It ought to be used, where the law has established no specific remedy, and where in justice and good government there ought to be one.' 'There is no reason why the awarding of this particular writ does not fall within the jurisdiction of this court, or why it should be exclusively confined to the court of chancery.' In the opinion, then, of the very respectable court, which decided the motion made for a mandamus, in Sikes v. Ransom, 6 Johns. 279, the supreme court of New York possesses the power to issue this writ, in virtue of its general superintendence of inferior tribunals. The judiciary act confers the power expressly on this court. No other tribunal exists by which it can be exercised." 30 U.S. at 193-194.
 
 
 125
 The quoted language "warranted by the principles and usages of law" is from Section 13 of the Judiciary Act of 1789 which created the Supreme Court's appellate jurisdiction, and that section confers the identical appellate jurisdiction "from the circuit courts and the courts of the several states." It is perfectly clear, then, that the Court had the same power to issue corrective civil process to a state court.
 
 
 126
 The Bradley cases are significant, for present purposes, because they deal with the issue of judicial immunity in the context of the court's nonadjudicatory judicial duties. Bradley v. Fisher, supra, holds that immunity from liability in damages applies even to such nonadjudicatory functions as controlling membership in the bar. Ex parte Bradley, supra, therefore, must be read as dealing with activities as to which the common law immunity is applicable. In this context the case of Ex parte Virginia, 100 U. S. 339, 25 L.Ed. 676 (1879), is notable, for it recognizes that a state court judge can be made to answer criminally for violating the criminal provisions of the Civil Rights Act of 1870 in the performance of nonadjudicatory judicial duties. It seems clear that the same judge would under Bradley v. Fisher, supra, have been immune from liability for damages. Thus, the common law immunity recognized in Pierson v. Ray, supra, is confined to liability for damages. It is not even an immunity from criminal liability.
 
 
 127
 Section 14 of the Judiciary Act of 1789, the so-called "all writs" section, the modern counterpart of which is found at 28 U.S.C. Sec. 1651(a), gave all the courts of the United States the power "to issue writs . . . which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." From the virtual identity of language in the case of Sec. 13 "warranted by the principles and usages of law", and in the case of Sec. 14 "agreeable to the principles and usages of law" it seems clear that the law with respect to amenability to civil process was the same under both sections. The occasions upon which a lower federal court would be called upon to direct its process to state court judges were, of course, limited by the narrow grant, prior to 1870 of civil jurisdiction in such courts.[4] There was no federal question jurisdiction in the lower federal courts until the Civil Rights Act of 1866, 14 Stat. 27, and no general grant of such jurisdiction until 1875. See 18 Stat. 470. Thus it was only the Supreme Court which was likely to have occasion, prior to 1875, to issue corrective civil process against state or lower federal courts, and it is the practice of that Court that we must look for guidance as to the scope of judicial immunity.
 
 
 128
 It was once asserted with some force that state court judges were immune from the civil process of the Supreme Court issued pursuant to Section 13 of the Judiciary Act of 1789. In Martin v. Hunter's Lessee, 14 U.S., 4 L.Ed. 97 (1 Wheat.) 304 (1816), the assertion arose in the context of the refusal of the Court of Appeals of Virginia to obey the mandate of the Supreme Court in a case sustaining a claim based upon a treaty of the United States. The Virginia court contended that a writ of error could not run to it because it enjoyed sovereign immunity, and its judgments were, therefore, entirely immune from the power of the article III courts. Justice Story's opinion forcefully rejects the contention that the actions of state court judges are beyond the reach of the Supreme Court's corrective process, reverses the judgment of the Court of Appeals of Virginia, but declines to reach the question whether, if the second time around the mandate is disobeyed, the Supreme Court will issue a writ of mandamus. 14 U.S. at 361. The clear implication of Story's opinion, however, is that if compulsory process must be directed to a state court judge in order to enforce the Supreme Court's mandate, it will be. See also Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). Justice Johnson's concurring opinion is more tentative. He says:
 
 
 129
 "It will be observed, in this case, that the court disavows all intention to decide on the right to issue compulsory process to the state courts; thus leaving us, in my opinion, where the constitution and laws place us-supreme over persons and cases, so far as our judicial powers extend, but not asserting any compulsory control over the state tribunals." 14 U.S. at 361.
 
 
 130
 Johnson's timidity with respect to compulsory process acting upon the state court judges directly is not based upon any notion that at common law judges generally were immune from civil process. He merely expresses doubt considering the availability of injunctive relief directed against the parties, as to the necessity for resorting to compulsory or restrictive process upon the state tribunal. 14 U.S. at 381. For the most part Johnson has been proved to be right. Even with respect to removal jurisdiction, which especially prior to 1870 was the one area in which lower federal and state court judges were likely to come into conflict, the lower federal courts usually were able to vindicate their jurisdiction under Section 12 of the Judiciary Act of 1789 and subsequent removal statutes by the issuance of injunctions running to the parties only. See, e. g., Dietzsch v. Huidekoper, 103 U.S. 494, 497, 26 L.Ed. 497 (1880); French v. Hay, 89 U.S. (22 Wall.) 250, 22 L.Ed. 857 (1874). But the eventuality of contumacy in the removal situation is recognized in 28 U.S.C. Sec. 1447(b) which authorizes the lower federal courts to issue writs of certiorari, and such writs have on occasion been directed to state courts. E. g., State Improvement-Development Co. v. Leininger, 226 F. 884 (N.D.Cal.1914). In Deen v. Hickman, 358 U.S. 57, 79 S.Ct. 1, 3 L.Ed.2d 28 (1958) (per curiam), the Supreme Court faced the problem of a contumacious state court. It granted leave to file a petition for mandamus against a Texas court which persisted in a course deemed to be inconsistent with the mandate in a prior case. The writ did not actually issue, since the Court assumed that the Texas court would, the second time, obey. But Deen v. Hickman, supra, recognizes that the same power to issue compulsory corrective process to state judges exist as was recognized in Ex parte Bradley, supra, and in Ex parte Crane, supra, with respect to federal judges. See also In re Herndon, 394 U.S. 399, 89 S.Ct. 1107 22 L.Ed.2d 367 (1969) (per curiam), recognizing the power of the court to entertain a contempt motion directed against a judge who flouted the court's mandate.
 
 
 131
 There is no distinction between the Supreme Court's power, under Section 13 of the Judiciary Act of 1789, to issue a writ of mandamus, and the power of the lower federal courts, under Section 14 of that Act, to issue the same writ. Marbury v. Madison, supra, held that the writ could only be issued by the Supreme Court in aid of its appellate jurisdiction, not as an original matter. McIntire v. Wood, 11 U.S. (7 Cranch) 504, 3 L.Ed. 420 (1813), interpreted Sec. 14 as confining the lower federal courts' mandamus jurisdiction to cases in aid of their jurisdiction and not to original proceedings. That was so, except in the District of Columbia, until the enactment in 1962 of 28 U.S.C. Sec. 1361. From this it might be argued that although judges are subject to compulsory civil process in aid of the jurisdiction of the issuing court, appellate or original, they are nevertheless immune from original corrective process such as an injunction. There are several defects in this argument.
 
 
 132
 The first defect is historical. Both the writ of mandamus and the writ of injunction emanated from the same source, the King's Chancellor. As to mandamus, see Chief Justice John Marshall's discussion, quoted above, in Ex parte Crane, supra. The equity jurisdiction of the lower federal courts, conferred originally in Section 11 of the Judiciary Act of 1789, is the jurisdiction of the Court of Chancery in that year. See, e.g., Markham v. Allen, 326 U.S. 490, 494, 66 S.Ct. 296, 90 L.Ed. 256 (1946); Sutton v. English, 246 U.S. 199, 38 S.Ct. 254, 62 L.Ed. 664 (1918); Farrell v. O'Brien, 199 U.S. 89, 25 S.Ct. 727, 50 L.Ed. 101 (1905). The Chancellor's equity jurisdiction had its origin in the King's Special Council, which was the predecessor of the Privy Council, and which aided the Crown in the exercise of its prerogative, which embraced matters not within the jurisdiction of the law courts. The Special Council eventually delegated to the Chancellor disposition of matters of grace which were within the King's prerogative. From this practice grew the Chancellor's equity, as distinguished from his ordinary jurisdiction. See 1 J. Pomeroy, A Treatise on Equity Jurisprudence, Secs. 31-38 (5th ed. 1941). (Hereinafter Pomeroy).
 
 
 133
 "From later records it appears that the council acted on all applications to obtain redress for injuries and acts of opression, wherever, from the heinousness of the offense, or the rank and power of the offender, or any other cause, it was probable that a fair trial in the ordinary courts would be impeded, and also wherever, by force and violence, the regular administration of justice was hindered." 1 Pomeroy, Sec. 31 at p. 37.
 
 
 134
 Thus, the equitable jurisdiction referred to in the Judiciary Act of 1789 was an aspect of the sovereignty of the King, ceded to the central government by article III of the Constitution, and conferred by Congress on the lower federal courts in Sec. 11 of that Act. Judicial immunity, on the other hand, presented a different aspect of the King's sovereignty. The King was the repository of all sovereignty, including judicial power. The common law judges were his surrogates in exercising his judicial power. Their immunity was merely a corollary to his.[5] Permitting an action for damages against one of the King's surrogates in a court of coordinate authority would slander his justice. Floyd v. Barker, 12 Co.Rep. 23, 25, 77 Eng.Rep. 1305, 1307 (Star Chamber 1607); Randall v. Brigham, 74 U.S. (7 Wall.) 523, 539, 19 L.Ed. 285 (1868); Pierson v. Ray, 386 U.S. 547, 558, 565, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (Douglas, J. dissenting). But the rationale for immunizing the King's surrogates from damage suits in courts of coordinate authority simply does not apply when the issue is immunity from the compulsory civil process of the Chancellor exercising the King's prerogative. Indeed the very suggestion that the law judges were immune from compulsory civil process issued by the Chancellor exercising the King's prerogative is inconsistent with the long history of complaints by the law judges to Commons about the Chancellor's interference with proceedings in their courts.[6] See 1 Pomeroy Sec. 39 at p. 44. The King's prerogative, formerly exercised by the Chancery Court, is by virtue of article III, a part of the judicial power of the United States, and is exercised by each of the federal courts within the respective jurisdictions conferred by Congress. There is simply no valid distinction between the powers of any of these courts to subject judges to compulsory process in the exercise of the prerogative on behalf of what in matters of federal concern is the superior sovereignty.
 
 
 135
 The second defect is pragmatic. The effect upon the respondent judge is the same in each case. He is directed, upon pain of punishment for disobedience, to conform his future conduct to the issuing court's order. If a judge is immune from one such order he should be immune from all. Notions of judicial independence, to the extent that they are relied upon to support the common law immunity of judges, apply equally to any compulsory process, whether issued in aid of the jurisdiction of the issuing court, or as an original proceeding.
 
 
 136
 The cases, then, in which the Supreme Court has entertained applications for writs of mandamus to federal and state court judges, and the cases in which federal courts have directed writs of certiorari or subpoenas to state court judges, are authority for the absence of any judicial immunity from civil coercive process directed at controlling future conduct, and those cases have in no way been affected by the decision in Pierson v. Ray, supra.
 
 
 137
 Those cases in which since Pierson v. Ray, supra, courts have directed their attention to the distinction between immunity from liability for damages and immunity from compulsory process to control future conduct have recognized as much. See Erdmann v. Stevens, 458 F.2d 1205, 1208 (2d Cir. 1972), cert. denied, 409 U.S. 889, 93 S.Ct. 126, 34 L. Ed.2d 147 (1972); Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972), cert. granted, 411 U.S. 915, 93 S.Ct. 1544, 36 L.Ed.2d 306 (1973); Jacobson v. Schaefer, 441 F.2d 127, 130 (7th Cir. 1971); Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970); United States v. McLeod, 385 F. 2d 734, 738 n. 3 (5th Cir. 1967) (implicitly); Haley v. Troy, 338 F.Supp. 794, 800 (D.Mass.1972); Cassidy v. Ceci, 320 F.Supp. 223, 228 (E.D.Wis.1970); Rakes v. Coleman, 318 F.Supp. 181, 192 (E.D.Va.1970); Koen v. Long, 302 F. Supp. 1383, 1389 (E.D.Mo.1969), aff'd per curiam, 428 F.2d 876 (8th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 827 (1971); Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 123 (S.D. N.Y.1969) (three-judge court) (Friendly, J.), aff'd on other grounds, 401 U.S. 154, 158 n. 9, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) (appellants did not appeal on this ground); Stambler v. Dillon, 288 F.Supp. 646, 649 (S.D.N.Y.1968); see also United States v. Clark, 249 F.Supp. 720, 727-728 (S.D.Ala.1965) (three-judge court) (decided prior to Pierson v. Ray, supra).
 
 
 138
 As to the opinions referred to by the majority as representative of the other side of the issue, not one of the cited cases actually discusses the distinction between an action for damages and compulsory process directed at future conduct. Each opinion either does not disclose whether a claim for injunctive relief was pleaded,[7] or deals only with a claim for money damages,[8] or denies injunctive relief because of the inadequacy of the factual allegations,[9] or simply fails to recognize the difference between the two kinds of relief.[10]
 
 
 139
 The authority of Cooper v. Hutchinson, supra, has been in no way impaired by Pierson v. Ray, supra, and none of the respectable body of thoughtful opinion to which the majority makes reference reflects in the slightest upon its soundness. If we were to hold that judges are immune from coercive civil process as well as from liability for money damages we would be embarking upon unchartered waters indeed. It is true that the occasions on which it has been found necessary to subject judges to coercive civil process have been relatively infrequent. The infrequency, however, must be considered against the availability of last resorts such as those considered by the Supreme Court in In re Herndon, supra, and Deen v. Hickman, supra. If a new doctrine were announced, immunizing judges from coercive civil process, the occasions of contumacy might dramatically increase. I can think of no countervailing gain from the invention of a new immunity doctrine which would justify this risk.
 
 
 140
 One might make the contention that state court judges should be free from coercive civil process issued by any court except the Supreme Court, and that such a distinction would suffice to guard against contumacy since the Supreme Court would remain free to act. I would ask why any such distinction should be made, since all of the article III courts exercise the judicial power of the United States to the extent of their respective jurisdictions. Indeed I would see any such distinction as positively harmful, since it is perfectly clear that with a population of over 200 million the Supreme Court alone simply is unable to exercise effective appellate jurisdiction over the state judiciary and must for the most part leave the vindication of federally protected rights in the hands of the other article III courts. Those courts protect such rights from state interference at present chiefly through their habeas corpus and Civil Rights Act jurisdiction. 28 U.S.C. Sec. 2254, Sec. 1343. It has been suggested that Congress should route appeals in state cases through an intermediate article III court. See Hufstedler, Comity and The Constitution: The Changing Role of The Federal Judiciary, 47 N.Y.U.L.Rev. 841 (1972). The trend toward a caseload situation where that may be essential seems clear. This is hardly the time to invent new doctrines of immunity which would complicate the performance of additional duties by the lower federal courts with respect to state court litigation.
 
 
 141
 I would advise the district court that it was right when it rejected the defense of judicial immunity in the context of a Civil Rights Act complaint seeking injunctive relief.
 
 
 142
 McLAUGHLIN, Circuit Judge, concurs in this opinion.
 
 
 143
 ALDISERT, Circuit Judge (concurring).
 
 
 144
 Judge Gibbons' scholarly defense of his position compels this brief response. I find nothing in his analysis which refutes the basic rationale expressed by Chief Justice Warren in Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967): "This immunity applies even when the judge is accused of acting maliciously and corruptly, and it 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.' (Scott v. Stansfield, L.R. 3 Ex. 220, 223 (1868), quoted in Bradley v. Fisher, supra, 349, note, at 350 [of 80 U.S. (13 Wall.)].) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation."
 
 
 145
 This reasoning seems to be applicable to injunctive actions against state judges predicated on the performance of judicial acts. Inherent in the injunction process are the necessary sanctions available to insure enforcement of decrees. Because these sanctions take the form of imprisonment or fine for contempt, I perceive this "intimidation" to be as pernicious as the threat of an adverse money judgment.
 
 
 146
 Moreover, I am not willing to accept the characterization that Judge Gibbons' view is "settled law in this circuit." I suggest that his approach is a formidable effort to engraft an exception to the landmark case of Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966).
 
 
 147
 In any event, any notion that the law is settled in this field should have been completely dispelled when the Supreme Court granted certiorari on April 2, 1973, in Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972).
 
 
 
 [1]
 The district attorney was eventually dismissed by stipulation when it appeared that his office had nothing to do with the intake procedures of the Philadelphia Juvenile Court
 
 
 [2]
 See, e. g., Wisconsin v. Constantineau, 400 U.S. 433, 437-439, 91 S.Ct. 507, 27 L.Ed. 2d 515 (1971); Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970) (per curiam); Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). But cf. Allegheny Airlines, Inc. v. Pennsylvania Pub. Util. Comm'n, 465 F.2d 237 (3d Cir. 1972)
 
 
 [3]
 This abstention doctrine is generally traced to Justice Frankfurter's opinion in Railroad Comm'n of Texas v. Pullman Co., supra
 
 
 [4]
 But cf. Allegheny Airlines, Inc. v. Pennsylvania, supra, which did not involve the court's civil rights jurisdiction
 
 
 [5]
 Several courts have approved of this distinction. See Erdmann v. Stevens, 458 F. 2d 1205, 1208 (2d Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972); Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972); Jacobson v. Schaefer, 441 F.2d 127, 130 (7th Cir. 1971); Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970); United States v. McLeod, 385 F.2d 734, 738 n. 3 (5th Cir. 1967) (implicitly); Haley v. Troy, 338 F.Supp. 794, 800 (D.Mass. 1972); Cassidy v. Ceci, 320 F.Supp. 223, 228 (E.D.Wis. 1970); Rakes v. Coleman, 318 F.Supp. 181, 192 (E.D. Va. 1970); Koen v. Long, 302 F.Supp. 1383, 1389 (E.D.Mo. 1969), aff'd per curiam, 428 F.2d 876 (8th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L. Ed.2d 827 (1971); Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 123 (S.D.N.Y. 1969) (three-judge court) (Friendly, J.), aff'd on other grounds, 401 U.S. 154, 158 n. 9, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) (Appellants did not appeal on this ground); Stambler v. Dillon, 288 F.Supp. 646, 649 (S.D.N.Y. 1968); United States v. Clark, 249 F.Supp. 720, 727-728 (S.D. Ala. 1965). Cf. Hadnott v. Amos, 394 U. S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969)
 
 
 [1]
 See Mitchum v. Foster, 407 U.S. 225, 231-233 & n. 10, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); Younger v. Harris, 401 U.S. 37, 43-45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)
 
 
 [2]
 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)
 
 
 [3]
 Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L. Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L. Ed.2d 781 (1971); (per curiam); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971) (per curiam)
 
 
 [4]
 Muskrat v. United States, 219 U.S. 346, 351-353, 31 S.Ct. 250, 55 L.Ed. 246 (1911) (interpreting Hayburn's Case, 2 Dall. 409, 1 L.Ed. 436 (1972)
 
 
 [5]
 North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)
 
 
 [6]
 See id
 
 
 [7]
 See Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 151-152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [8]
 263 F.Supp. 327 (N.D.Ala. 1966), aff'd 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam)
 
 
 [9]
 See Singleton v. Board of Commissioners, 356 F.2d 771 (5th Cir. 1966)
 
 
 [10]
 263 F.Supp. 327, 330 quoting Henderson v. United States, 339 U.S. 816, 823, 70 S. Ct. 843, 94 L.Ed. 1302 (1950)
 
 
 [11]
 Lee v. Washington, 390 U.S. 333, 88 S. Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam)
 
 
 [12]
 52 F.R.D. 389 (D.Conn. 1971)
 
 
 [13]
 Compare Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178 3 L.Ed.2d 222 (1958); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Kelly v. Wyman, 294 F.Supp. 887, 890 (S.D.N.Y. 1968) (3-judge court) aff'd sub nom. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)
 
 
 [14]
 See Vaughan v. Bower, 313 F.Supp. 37, 40 (D. Ariz.) (3-judge court), aff'd, 400 U.S. 884, 91 S.Ct. 139, 27 L.Ed.2d 129 (1970); Cypress v. Newport News General & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 657 (4th Cir. 1967)
 
 
 [15]
 See North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 81 L.Ed. 617 (1937))
 
 
 [16]
 The majority opinion may be read to hold broadly that the judicial immunity doctrine presents no obstacle to the maintenance of an injunctive suit. It should be noted, however, that it is at least doubtful whether the issue is squarely before us. The district court held there was no immunity and the defendants have not filed a cross-appeal on this ruling. Furthermore, even if before us, the judicial immunity doctrine might not have to be met head-on in the present case. Plaintiffs are attacking the procedural rules adopted by a state court. It may be contended that they are not assailing a decision or ruling by a judge acting in his judicial capacity. Under these circumstances, the judge may be a nominal party to this action
 
 
 [17]
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Later in Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), plaintiffs brought suit in federal court against city officials praying an injunction restraining them from preventing plaintiffs from remaining in the city, distributing printed material, or holding public meetings. The Supreme Court did not question the propriety of exercising federal equitable power. See Lewis v. Kugler, 446 F.2d 1343, 1350 (3d Cir. 1971)
 
 
 [18]
 See generally H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 846-57 (1953)
 
 
 [19]
 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)
 
 
 [20]
 Id. at 498, 61 S.Ct. at 644
 
 
 [21]
 Id. at 499, 61 S.Ct. at 645
 
 
 [22]
 Id. at 500, 61 S.Ct. at 645
 
 
 [23]
 See Siler v. Louisville & Nashville R.R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909)
 
 
 [24]
 See Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [25]
 See Baggett v. Bullitt, 377 U.S. 360, 375-378, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)
 
 
 [26]
 11 P.S. Sec. 246(3) (1965). Compare Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In Constantineau, the majority apparently rejected Chief Justice Burger's dissenting view that abstention was proper since the state Supreme Court might hold the practice, challenged there, to be violative of the state constitution. 400 U.S. at 440, 91 S.Ct. 507
 
 
 [27]
 Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Educ., 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). Accord, Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971); Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)
 
 
 [28]
 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). For a later case discussing the same principle in a slightly different context, see Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951)
 
 
 [29]
 Id. at 163, 63 S.Ct. at 881
 
 
 [30]
 Id. (citations omitted)
 
 
 [31]
 Id. at 164, 63 S.Ct. at 881
 
 
 [32]
 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)
 
 
 [33]
 Id. at 41, 91 S.Ct. at 749. Younger concerned only the propriety, not the power, of a federal court's enjoining a state criminal prosecution. The court left open the question "whether 28 U.S.C. Sec. 2283, which prohibits an injunction against state court proceedings 'except as expressly authorized by Act of Congress' would in and of itself be controlling under the circumstances of this case." Id. at 54, 91 S.Ct. at 755. That question, however, has now been resolved by Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), holding that 42 U.S.C. Sec. 1983 is excepted from the operation of the anti-injunction statute, 28 U.S.C. Sec. 2283. Under Mitchum, then, federal courts have the power, in Sec. 1983 cases, to enjoin state criminal proceedings. Whether that power should be exercised in any particular case depends upon the considerations set out in Younger. See Mitchum v. Foster, 407 U.S. at 243, 92 S.Ct. 2151
 
 
 [34]
 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)
 
 
 [35]
 401 U.S. at 54, 91 S.Ct. at 755
 
 
 [36]
 Id. at 43-44, 91 S.Ct. at 750
 
 
 [37]
 Id. at 46, 91 S.Ct. 746, quoting Fenner v. Boykin, 271 U.S. 240, 243, 46 S.Ct. 492, 70 L.Ed. 927 (1926)
 
 
 [38]
 Id. quoting Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)
 
 
 [39]
 Id. at 47, 91 S.Ct. at 752, quoting Douglas v. City of Jeannette, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324 (1943)
 
 
 [40]
 Because of the reasons upon which my position is grounded, it is neither necessary nor appropriate to decide whether the present case involves a pending state criminal proceeding. Some may well have questioned after the Younger series of cases whether the rule enunciated there and the policy considerations from which it stems are applicable to cases not involving pending state criminal proceedings. In the Younger group, however, the majority opinions emphasized over and over again that state criminal proceedings were pending. In fact, it was because of the pending state proceedings that the Court believed the federal plaintiffs had an adequate remedy at law, namely, a constitutional defense to the criminal prosecutions. See Younger v. Harris, 401 U.S. 37, 46-49, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Moreover, it was because of the pending proceedings that the Court required, for reasons of comity, that the plaintiffs demonstrate irreparable harm " 'both great and immediate.' " Id. at 46-47, 91 S.Ct. 746. Any uncertainty about the reach of the Younger principle has to a great extent been set to rest. In Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), the Supreme Court stated that the cases in the Younger series "were premised on considerations of equity practice and comity in our federal system that have little force in the absence of a pending state proceeding. In that circumstance exercise of federal court jurisdiction ordinarily is appropriate if the conditions for declaratory or injunctive relief are met." Id. at 509, 92 S.Ct. at 1757
 
 
 [41]
 In Boyle v. Landry, 401 U.S. 77, 91 S. Ct. 758, 27 L.Ed.2d 696 (1971), the allegations of the complaint failed to demonstrate irreparable injury. "Not a single one of the citizens who brought this action had ever been prosecuted, charged, or even arrested under the particular intimidation statute." Id. at 80, 91 S.Ct. at 760. In Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), the practical effect of declaratory or injunctive relief would have been as in Younger and Samuels, the effective termination of state proceedings. Both Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971) (per curiam) and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971) (per curiam), were cases where criminal prosecutions were pending and in which the district court made no findings of irreparable harm
 
 
 [42]
 401 U.S. 77, 80, 91 S.Ct. 758, 27 L.Ed. 2d 696 (1971)
 
 
 [43]
 Although plaintiffs did originally request injunctive relief against the state's proceeding on any juvenile petition, at oral argument counsel indicated that in his view such relief is barred by the Younger principle. See fn. 40, supra
 
 
 [44]
 See Brown v. Fauntleroy, 143 U.S.App. D.C. 116, 442 F.2d 838 (1971) (right to preliminary hearing for juveniles); Cooley v. Stone, 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969) (per curiam) (right to preliminary hearing for juveniles); Pugh v. Rainwater, 332 F.Supp. 1107 (S.D.Fla. 1971) (same for adults)
 
 
 [45]
 446 F.2d 1343 (3d Cir. 1971). See Pugh v. Rainwater, 332 F.Supp. 1107 (S.D.Fla.1971)
 
 
 [46]
 446 F.2d at 1347
 
 
 [47]
 Id. at 1349
 
 
 [48]
 Id
 
 
 [49]
 See Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed. 2d 257 (1972)
 
 
 [50]
 Although habeas corpus relief can, under some circumstances, be sought by one detained, see Henry v. Henkel, 235 U.S. 219, 228, 35 S.Ct. 54, 59 L.Ed. 203 (1914) (in "exceptional circumstances"); Baker v. Grice, 169 U.S. 284, 18 S.Ct. 323, 42 L.Ed. 748 (1897); Ex Parte Royall, 117 U.S. 241, 252-253, 6 S.Ct. 734, 29 L.Ed. 868 (1886); Reis v. U. S. Marshal, 192 F.Supp. 79 (E.D.Pa.1961); compare Commonwealth ex rel. Levine v. Fair, 394 Pa. 262, 146 A.2d 834 (1959) with Commonwealth ex rel. Bittner v. Price, 428 Pa. 5, 235 A.2d 357 (1967) (per curiam), habeas relief or an appeal on the issue of improper pretrial detention is generally unavailable once an indictment has been returned or a finding of guilt has been made. See, e. g. Rivera v. Government of Virgin Islands, 375 F.2d 988 (3d Cir. 1967); Grace v. United States, 375 F.2d 119 (9th Cir. 1967); Blue v. United States, 119 U.S.App.D.C. 315, 342 F.2d 894 (1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965). See generally Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U.Pa.L.Rev. 793 (1965). At oral argument, counsel pointed out that the problem of obtaining state habeas relief might be compounded by the fact that one state judge would be required to review a decision by one of his brethren
 
 
 [51]
 E. g., Wilwording v. Swenson, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L.Ed.2d 418 (1972) (per curiam). Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)
 
 
 [52]
 Plaintiffs' due process argument must rest, in part at least, on the premise that the Fourth Amendment's bar against unreasonable searches and seizures applies to the "arrest" or "detention" of persons as well as the seizure of goods. See Terry v. Ohio, 392 U.S. 1, 8-9, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Henry v. United States, 361 U.S. 98, 100-101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Brown v. Fauntleroy, 143 U.S.App.D.C. 116, 442 F. 2d 838 (1971). "[I]t can no longer be seriously contended that an action for money damages will serve adequately to remedy unconstitutional searches and seizures." Lewis v. Kugler, 446 F.2d 1343, 1350 (3d Cir. 1971). See Mapp v. Ohio, 367 U.S. 643, 652, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Lankford v. Gelston, 364 F.2d 197, 202 (4th Cir. 1966) (en banc)
 
 
 [53]
 Although at this stage of the proceedings the question before us is whether the district court improperly declined to exercise its jurisdiction, it might be helpful to note what is at the heart of this controversy. Plaintiffs have alleged that: (1) it is a denial of equal protection for the Commonwealth to provide adults a preliminary hearing to determine probable cause and yet at the same time deny such a safeguard to juveniles; (2) it is a denial of due process for the state to detain juveniles without a preliminary hearing or an equivalent procedure to determine probable cause and (3) it is a denial of due process for the Commonwealth to incarcerate juveniles on the basis of an "intake interview" lacking procedural protections. These are serious claims raising complex legal issues
 Detaining juveniles without a probable cause hearing has been assailed by sociologists as well as legal scholars. See generally, L. Forer, "No One Will Lissen," 67-83 (Grossett Dunlap 1971); Weiss, The Poor Kid, 9 Duquesne L.Rev. 590, 596-599 (1971). Many believe that such incarceration, far from serving a salutory purpose, frequently does just the reverse: those already alienated may become more bitter when confronted by a system they perceive to be unjust and insensitive.
 
 
 [1]
 Conover v. Montemuro, 477 F.2d 1073 (3d Cir. 1972)
 
 
 [2]
 Id. at 1073
 
 
 [3]
 The district court in this case noted (1) that Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966), both involved actions for damages under Sec. 1983, and (2) that Judge Montemuro was a person "working in a quasijudicial capacity." We intimate no view concerning the significance of these two factors in the determination whether, generally or in a particular case, a state judge enjoys immunity from a Sec. 1983 injunctive suit. On the possible relevance of the distinction between judges acting in judicial capacities and those acting in quasi-judicial capacities, see e. g., Ex Parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879)
 
 
 [4]
 "Even though there is no absolute immunity against an injunction issued by a federal court to a state court judge, certainly this power should be exercised with greater restraint than in the case of other state officers. An injunction should not be issued except where the lack of an adequate remedy at law is very clear and where the possibility of relief in the state courts is effectively foreclosed. It should not issue unless the irreparable injury is of a grave and substantial nature." Appellee's Petition for Rehearing En Banc at 2. (Emphasis added)
 
 
 [5]
 Compare, e. g., Robinson v. McCorkle, 462 F.2d 111 (3d Cir. 1972) (declaratory judgment); Gaito v. Ellenbogen, 425 F.2d 845 (3d Cir. 1970); Cooper v. Hutchinson, 184 F.2d 119 (3d Cir. 1950); Mackay v. Nesbett, 412 F.2d 846 (9th Cir. 1969), aff'g, 285 F.Supp. 498 (D.Alaska 1968), cert. denied, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969); Cade v. Carpenter, 367 F.2d 572 (5th Cir. 1966); Rhodes v. Houston, 309 F.2d 959 (8th Cir. 1962), aff'g, 202 F.Supp. 624 (D. Neb.1962), cert. denied, 383 U.S. 971, 86 S.Ct. 1282, 16 L.Ed.2d 311 (1966), 372 U.S. 909, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963); Gay v. Heller, 252 F.2d 313 (5th Cir. 1958); Kenney v. Fox, 232 F.2d 288 (6th Cir.), cert. denied, 352 U.S. 855, 77 S.Ct. 84, 1 L.Ed.2d 66 (1956); Tate v. Arnold, 223 F.2d 782 (8th Cir. 1955); with, e. g., Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972), cert. granted, 411 U.S. 915, 93 S.Ct. 1544, 36 L.Ed.2d 306
 Erdman v. Stevens, 458 F.2d 1205, 1208 (2d Cir. 1972), cert. denied, 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972); Jacobson v. Schaefer, 441 F.2d 127, 130 (7th Cir. 1971); Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 123 (S.D.N.Y. 1969) (3-judge court), aff'd on other grounds, 401 U.S. 154 n. 9, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971); Cassidy v. Ceci, 320 F.Supp. 223 (E.D.Wis.1970); Rakes v. Coleman, 318 F.Supp. 181 (E.D.Va. 1970).
 It is significant that the United States Supreme Court recently granted certiorari in a case raising this specific issue. Berbling v. Littleton, supra, cert. granted, sub nom. O'Shea v. Littleton, Spomer v. Littleton, 411 U.S. 915, 93 S.Ct. 1544, 36 L.Ed.2d 306 (1973). The petition and briefs set forth in extenso the various cases and authorities bearing on the matter.
 
 
 [1]
 See also, Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) (per curiam); Brown v. Allen, 344 U.S. 443, 459, 73 S.Ct. 397, 97 L.Ed. 469 (1953); J. E. Riley Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 85 L.Ed. 36 (1940); United States v. American Ry. Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892 (1921)
 
 
 [2]
 See Dombrowski v. Pfister, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Stefanelli v. Minard, 342 U.S. 117, 124 n. 12, 72 S.Ct. 118, 96 L.Ed. 138 (1951)
 
 
 [3]
 In Pierson v. Ray, supra, Chief Justice Warren did not say whether the common law referred to was state or federal. Justice Frankfurter in Tenney v. Brandhove, supra, seems to assume that the federal court must look to the common law of the state in question. See 341 U.S. at 375, 71 S.Ct. 783. No Pennsylvania case has ever suggested that judicial immunity includes immunity from coercive civil process
 
 
 [4]
 Shortly after the issue of state sovereignty became heated in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793); and before Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816), and Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821), state judges were subjected to the compulsory process of the federal courts. As early as 1795, Pennsylvania State Court judges were subpoenaed to testify in a trial in the circuit court, Pennsylvania District. They did not appear, and the United States Attorney applied for a body attachment. The attachment did not issue, but the judges at circuit withheld the arrest as a matter of grace. Mr. Justice Paterson, sitting as a circuit justice, had this to say:
 "We pay no respect to persons. The law operates equally upon all; the high and low, the rich and poor. If we issue a subpoena to a justice or a judge, and it is not obeyed, we should be more strict in our proceedings against such characters, than against others, whose office did not so strongly point out their duty." United States v. Caldwell, 2 U.S. (2 Dall.) 333, 1 L.Ed. 404, 25 Fed.Cas. 238 (1795).
 
 
 [5]
 In fact, the English judges could be made to account for their actions before the King. In 1607, the Court of the Star Chamber stated that:
 "[I]t appears by . . . precedent and chronicle, that the King did examine the corruption of his Judges before himself in the Parliament, and not by force of any commission." Floyd v. Barker, 12 Co.Rep. 23, 26, 77 Eng.Rep. 1305, 1308 (1607).
 
 
 [6]
 The Chancellor's interference with proceedings in other courts was not limited to the law courts. Under English law the Ecclesiastical courts had jurisdiction to dispose of a decedent's personalty. See 2 R. Roper, Treatise on the Law of Legacies at 1791 et seq. (1847). However, this jurisdiction did not extend to assets of an estate which were subject to a trust. Mr. Justice Story notes that:
 "[I]f the Spiritual Courts attempt to enforce the payment of a legacy which involves a trust, a Court of Equity will award an injunction in order to protect its own exclusive jurisdiction." (Footnotes omitted). 1 J. Story, Equity Jurisprudence at 601 (13th ed. 1886).
 
 
 [7]
 Cade v. Carpenter, 367 F.2d 572 (5th Cir. 1966) (per curiam) Compare the above with United States v. McLeod, supra, decided in the same court
 
 
 [8]
 Robinson v. McCorkle, 462 F.2d 111 (3d Cir. 1972); Rhodes v. Houston, 309 F.2d 959 (8th Cir. 1962) (per curiam), aff'g 202 F.Supp. 624 (D.Neb.1962), cert. denied, 383 U.S. 971, 86 S.Ct. 1282, 16 L.Ed. 2d 311 (1966), 372 U.S. 909, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963); Gay v. Heller, 252 F.2d 313 (5th Cir. 1958); Kenney v. Fox, 232 F.2d 288 (6th Cir.), cert. denied, 352 U.S. 855, 77 S.Ct. 84, 1 L.Ed.2d 66 (1956)
 
 
 [9]
 Gaito v. Ellenbogen, 425 F.2d 845 (3d Cir. 1970), involved a claim for money damages and the immunity discussion refers to this claim. MacKay v. Nesbett, 412 F.2d 846 (9th Cir. 1969) (per curiam), aff'g 285 F.Supp. 498 (D.Alaska 1968), cert. denied 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969), turns not on immunity but on scope of review in a disbarment proceeding
 
 
 [10]
 Tate v. Arnold, 223 F.2d 782 (8th Cir. 1955). The case involves a claim both for money damages and for injunctive relief. The opinion makes no distinction between the two claims but, significantly, explicitly recognizes Cooper v. Hutchinson, supra, as contrary authority, 223 F.2d at 785